We'll hear argument in the last matter on today's argument calendar. Andes Petroleum Ecuador, the Occidental Exploration and Production Company, 21-3039. Good morning, or good morning, one minute. Good morning, your honors, and may it please the court, Paul Clement for the appellants. Arbitration is first and foremost a matter of contract. And the contract here provided that the arbitrators shall be and remain at all times wholly independent and impartial. The contract reinforced that requirement of strict neutrality with the express incorporation of the AAA rules which promote independence and impartiality by requiring extensive disclosures by potential arbitrators, the parties, and their representatives, including, quote, any past or present relationship with the parties or their representatives, end quote. The rules further underscore that this obligation shall remain in effect throughout the arbitration. Finally, it bears emphasis that this was not a situation where the parties sought out highly technically specialized arbitrators with unique knowledge of a technical field like reinsurance or maritime contracts, where extensive entanglements were inevitable. What evidence, I mean, and maybe this is part of your argument, but what is the evidence that Mr. Schor and Mr. Smith really interacted in any substantive way as co-arbitrators? Oh, they interacted, I mean, first of all, let me just say that we are at something of a disadvantage because the other arbitration procedure is confidential and so we only know sort of the broad outlines. That's part of why your alternative request is for an evidentiary period of some sort. That's exactly right, Your Honor. But here's what we know. We know that this second arbitration where they served as co-equals or co-neutrals, it wasn't available to us at the beginning of the process. So the due diligence that was done at the beginning would not have unearthed this. It started just a few months later. It went on for two years. So it was ongoing almost for the entire period of the arbitration that we care about. 2018 to 2020, you said. Yeah, exactly. And the overlap in terms of the timing is really striking. And just to get directly to your question about like the overlap, I mean, they sat for, this is October of 2019. They sat for an entire week in person hearing evidence. And so for that entire week. I think they can argue that he would have had access to his thought processes and there's a big risk of partiality. But haven't you said that a reasonable person would need to conclude there was partiality in the outcome? No. No, no. They would, the test is whether a reasonable observer would have to conclude that there was a risk of partiality. Evident partiality is not an actual bias standard. That is clear. So you don't have to show that there was actual partiality. What you have to do is that. Well, be compelled to conclude that there was a risk of partiality. Yes. And that seems clear. It's a very high standard to me, but maybe I've misunderstood the standard. Well, it's a high standard, but it's not an impossible standard to meet. And when you have this week-long access. And just to finish the point, this is in October 2019. The next week, there's a hearing in this arbitration. So these are two people who have sat as co-neutrals for the entire week before in person. And then Mr. Schor is allowed to effectively step down from the dais and make arguments to the person that he's just had a week of insights into everything he knows. And Smith and Schor are both under a contractual obligation and a rule-based obligation to disclose that, and neither of them do it. And that's what I think the reasonable observer is going to see. Not just that, you know, there's some fact that Smith knowed that he just didn't disclose, but nobody else knew it. They're going to see that the two of them sat together. No, no, but that is not enough to, as evidence of partiality. Partial to a party. So, you know, you and I could be friends and know each other. In fact, we've met each other and we could talk. But the fact that we had some relationship, even an ongoing relationship, doesn't mean that I'm going to be partial to your argument. So what is the evidence of partiality? I just want to clarify the standard, right? So go ahead and explain the evidence of partiality. Sure. So the evidence of partiality is that the other side has this access and all of these insights, and so, I mean, to me, the easiest way to say this is, and this is, I think, what distinguishes this case from prior precedents, is this is not a situation where two people have sat as neutrals together in some other panel. This is, they've kind of crossed the lines between neutrality and being a party advocate. So if, for example, I found out, shockingly, that the three of you had sat together yesterday and heard cases together, I would not think there was any partiality involved in that. If I found out that, actually, yesterday, one of you couldn't sit and my friend for Andes had sat with you and heard all of these cases yesterday as a co-equal and got all those insights into your mental processes and your deliberative processes. And then he was arguing against me today, I would, and I think any reasonable observer would, say there's partiality here. There's- So I guess that's my question. Is it, do we have to determine there's partiality or a risk of partiality? So didn't we say in the supply industry, industrial materials corporation, that a reasonable person would have to conclude that an arbitrator who failed to disclose under such circumstances was partial to one side? We don't have to determine there was partiality or only that there was a risk. That a reasonable would, well, I mean, there's a couple of things, Your Honor. First of all, in understanding what the sort of the standard is, I do think it is not that they have to find partiality. It's whether a reasonable observer would be given pause. There's a lot of different ways that the court has formulated over the years. But I think you have to also, and this is what the court said in- In fact, the statute says evident partiality, right? Absolutely, absolutely. But the Supreme Court, for what it's worth, interpreted that standard in commonwealth codings. And in the context of commonwealth codings, it actually said that in a circumstance where there was information that they didn't say there was actual bias, they didn't say it was the same standard for necessarily for an Article III judge. But under those circumstances, they said you should have disclosed it. And the failure to disclose combined with the underlying fact together was enough to vacate, in that case, a unanimous arbitration award. And I think this flows directly from that. And I do think, and I think it's critically important for the policies behind arbitration. Because- But just to be precise, you don't actually think that it's necessarily true that if we had been on a panel yesterday with your opposing counsel, we would necessarily decide this case in a biased way. It's just that that gives it an unfair advantage and there's a risk of partiality, right? And what I would say is the combination of the fact that you sat together and the fact that there was a contractual disclosure obligation that was not complied with. Those two things would lead any reasonable observer to say that there was- Because that's a partiality. Partiality. Doesn't that kind of assume the conclusion, right? The contractual disclosure doesn't say disclose if you have, if a lawyer has sat on an arbitration panel in another matter with an arbitrator, right? The contractual disclosure in general says impartiality, that we need impartial folks. And if you're, I gather, you're incorporating the AAA, which I've lost the language here. It's got to be any bias or financial or personal interest that you give rise to a justifiable doubt as to arbitrators' impartiality. So isn't the threshold question whether this particular connection would in fact give rise to a justifiable doubt about the arbitrator's impartiality or independence? I think that's fair, Your Honor, but I don't think that's a hard question. And I would say two things about that. One is, I think if you actually look at the text of the AAA rules, they specifically impose the obligation to disclose any circumstance likely to give rise to a justifiable doubt as to the arbitrator's impartiality or independence. And then they say, specifically including those financial arrangements and any past or present relationship with the parties or the representatives. So that's definitionally something that gives rise to justifiable doubts. They don't say any circumstance, including all this stuff, that might give rise to justifiable doubts. They define the circumstances that might give rise to justifiable doubts, and they include these. You understand relationship broadly. Relationship isn't, if you think about some of the things that were disclosed. My law firm did some work for these folks who were tied in with these folks. Those are sort of business relationships. You're interpreting relationship to be personal familiarity. First of all, I am interpreting it that, but I think that whatever is an edge case, service on an arbitral panel for years, contemporaneously, is absolutely covered by this. So how much of your argument depends on the contemporaneous nature of this? If this had not, if it had been three years ago that they sat on an arbitration panel together and this hadn't been on the list of disclosures at the outset, wouldn't it have been the same relationship that wasn't disclosed? So, two things, Your Honor, if I could. One, I still think there would be a violation. I think it would be a harder case for me to show that that was- A violation of the AAA rules? Yes, of the AAA rules. No, no, of the AAA rules. Yeah, I don't know that it's really disputed that there's some violation of the AAA rules, but maybe it is. Well, I took Judge Robinson's question to sort of go to that question first. And I think, just to get the answer on the table, if it's helpful, is I do think the prior relationship, the prior service together would be something that you'd have to disclose. And indeed, there were disclosures to that effect. But I do think it's much more serious to not disclose this concurrent service. Because then you know what, Soren knew what the issues were in our arbitration. We don't know the exact overlap of the two issues, but we raised virtually every contractual defense known to personhood in this case. There was an email, and so it's interesting, I've not seen that as an issue. But it may be on the table of whether he was required to disclose or not disclose under the AAA rules. But there was an email, it's somewhere in the record, 219, I think, where Smith says that he's had a relationship, or he's on a new deal, and this is 2017, with Schor. Is that right? That's right, but it's a completely different deal. It has nothing to do with this. And it's not- He discloses that relationship. Now, of course, your point is, like his relationship with David Rivkin and others, that it's these minor relationships that he discloses. And here's the elephant in the room, and he doesn't disclose that. Absolutely, Your Honor. And I think the fact that he discloses all of these minor entanglements, if you will, sort of gives the lie to the idea that this was innocent, and he thought the IBA guidelines were what he should be following, instead of the expressly incorporated AAA rules, because none of the stuff he disclosed under their reading of the IBA guidelines would he have to disclose. Would it matter if at an evidentiary hearing he explained why he didn't disclose it? Maybe he forgot it, or does it, what would you look for in a hearing? So, a couple of things, Your Honor. One is, I don't think it does, which is why we sort of made this argument essentially as a matter of law. But as our fallback argument, I think if you're trying to figure out what the reasonable observer would conclude, I think the reasonable observer would want to know how much overlap was there between the issues. And as I said, I can't imagine there wasn't substantial overlap between the issues, because we raised virtually every contractual defense. You mean with the ICC arbitration? Yeah, between the ICC arbitration and this AAA arbitration involving Ecuador. There has to be overlap, because we're raising all these contractual defenses. So, I'm not privy to what the ICC arbitration was about, but it's a contractual arbitration. And so, it seems to me quite likely that they were talking about various contractual defenses in the context of that case. And if they were talking about the same things, the partiality would be higher, because he gets insight into what he's thinking about those particular kinds of issues. Absolutely, and as the Supreme Court said in Commonwealth Codings, there's actually a greater concern in some respects in arbitration, because the federal rules of evidence are what the federal rules of evidence are. And so, having insight to how a judge thinks about the federal rules of evidence is useful, but not critical. But in a context where the arbitrators essentially get to make up the rules of evidence and various other things as they go along, constrained really only by the AAA rules, I mean, getting insights into that, that the other side doesn't have and doesn't know that you have, all of that seems to be the reason. Do you agree that the IBA rules didn't require this disclosure? I think they did. I think that they did both generally, but I also think that at most, the IBA guidelines suggest that it was Andes and their counsel that should have disclosed this rather than Smith. So if the IBA guidelines didn't disclose it, would that be a problem? I mean, it's hard to conclude that there's evident partiality of somebody who was proceeding by guidelines that are well recognized in these kinds of proceedings. So, would it be a problem for you if in fact the IBA guidelines would not require this disclosure when you're trying to make an argument that this non-disclosure is itself evidence of partiality? Well, it would be an unhelpful fact, but here's a very helpful fact for me, which is the first thing the IBA guideline, not the first thing, but one of the things the IBA guideline says with crystal clarity is these do not trump the applicable rules that govern the arbitration. They're just guidelines, as their name suggests. And they specifically say they don't trump the rules. The rules are the AAA rules. No, I understand, so the AAA rules apply, and there's a violation of the AAA rules. But we're not just determining whether there's a violation of the AAA rules. We're determining whether the non-disclosure of this relationship shows evident partiality. And if in fact there are well-recognized guidelines that wouldn't require that kind of disclosure, isn't it hard to conclude that this itself serves as evidence of partiality? I don't think so, Your Honor, especially if, you know, because even the IBA guidelines, first of all, they put the disclosure obligation on the counsel, not the arbitrator, so this is disclosable. So, we're talking like very much a hypothetical fact. The other thing the IBA guidelines say, though, and, you know, is it depends on facts and circumstances, and you should take that into account. And it seems to me the concurrent nature of these, the timing of these, and the duration of them. Again, I mean, it just seems inexplicable to me that for two years of our three-year arbitration, there was this concurrent service that crossed the lines of neutrality. And Andes knew about it, Schor knew about it, Smith knew about it. They all independently had disclosure obligations under the rules expressly incorporated into the contract. And they never once told us. And if you're a reasonable observer, and you're looking at not just the arbitrator's nondisclosure, but the party's nondisclosure at the same time, how are you supposed to not find evident partiality? Let's reserve a couple minutes of rebuttal. Let's hear from the other side, and then we'll hear from you again. Thank you very much, Your Honor. Thank you. May it please the court, I'm Scott Dauber on behalf of Andes Petroleum. First of all, I'd like to start with the test and to answer the question that Judge Menashe asked directly that I don't believe we got an answer to. First of all, from the Occidental Brief, page 20. Evident partiality exists whenever a reasonable person informed of the terms and the party's agreement and all relevant circumstances would have to conclude that an arbitrator was partial to one party. Not risk.  Partiality. Exactly. And the certain underwriting case makes the same point. And that has to be demonstrated with clear and convincing evidence, and they've fallen far short. I'd like to turn to the example that came up in the questioning of my friend regarding this panel. And had I sat with two of you yesterday, highly unlikely for many reasons, but assume that happened. That does not impact your partiality. The fact that I may have sat with two of you and had the benefit of seeing your thinking, your analysis, how you address legal issues, may give me some advantage. It doesn't make you partial. It doesn't undermine your independence. Putting aside, of course, that the test for a federal judge is different from an arbitrator, what does the fact, even if it were true, and it's total hypothesis, total speculation. But even if it were true, that Mr. Schor elicited some special insight, some magic knowledge. What it does is it makes the lawyer maybe better, but not the arbitrator partial to the lawyers. That is precisely right. And the only thing that matters under the evident partiality. Do we know that? I mean, if you and I had worked through this kind of issue yesterday in a different case, might I not have ended up more partial to your way of seeing things after we worked through that case yesterday? That is certainly hypothetically possible. There is no suggestion of that in this case whatsoever. And my friend talks about it, I believe he used the- So, go ahead. Please, Your Honor. So, why not have a hearing? I'll tell you exactly why. Because Occidental did not seek a hearing in the district court. They did not seek discovery in the district court. And my friend talks about being at an informational disadvantage regarding the other arbitration. That could have been readily solved. Four months passed. Because I understand that Juscello Steen is a wonderful judge, but he ruled very quickly. So, as I also understand it, they may not have had an opportunity to ask for anything. Is that wrong or is that right? Well, he did rule quickly, Your Honor, but there was four months of briefing. We filed our opening brief in, I believe, May 1st or May 2nd of 2021. And the briefing went on for four months. So, they had four months to seek to subpoena Mr. Smith, arbitrator Smith, and ask Mr. Smith the question. Why did you not disclose this? They had four months to subpoena Attorney Schor, who submitted a declaration under oath, under penalty of perjury, which is uncontested, in which he says, and it's in the record, of course, that he had no improper conversations, no ex parte conversations with Mr. Smith, that they never spoke ever alone without the presence of the third arbitrator. Didn't happen. That's uncontested. So now, after Judge Hallerstein rendered his decision, we're debating the question of an evidentiary hearing. And let me tell you why I think they intentionally did not seek discovery in the district court. Because they preferred the faint aroma of impropriety rather than getting at the heart of the question and asking the reasons why this wasn't disclosed. And I think the reason they avoided this discovery is precisely that. And here's the ultimate question. What was arbitrator Smith's motive here? To put his 40 year impeccable reputation on the line. What's the rationale? There is none. Same for Mr. Schor. Literally, 40 years of impeccable reputation. And for some reason, never articulated by my friend, by accidental, for some reason, they sacrificed, or were willing to sacrifice their reputations. For what? And this is exactly why this court has. So an error of disclosure, I don't know that an oversight necessarily protects an arbitrator from a charge of evident partiality, which is where I think we're going. And so, he made a mistake. I think we don't have to say that it was an evil motive, just that it was an oversight that the other side should have known about this relationship that was ongoing, contemporaneous. And maybe if they had a hearing, they would be satisfied, but maybe not. Yeah, respectfully disagree. I mean, this court has consistently held that non-disclosure does not by itself constitute evident partiality. The question is whether the facts that were disclosed suggest a material conflict of interest. That's Scandinavian re- Right, so the non-disclosure combined with the underlying relationships, right? Well, that's right. And the underlying relationships that this court, again, consistently, without fail, has considered to give basis for evident partiality are either financial or economic interest or family relationships. Every case, without exception, has found something in one of those two categories. Can I ask you about, just to give it a little bit, the calculation of the damages and the pre-judgment interest? Yes, of course, Your Honor. And I'll just preface this by saying, I don't understand what happened here. I don't understand the 360 day a year issue. I don't understand how Judge Hellerstein came up with this number. So help me. There are two issues with regard to the damages, the interest calculation. I'm happy to focus on the latter one, which is the 360 versus 365. But there's another issue, which I think is also briefed, but I'll forego that unless you ask me to. Compound interest issue, and then I think maybe both, but I'm very confused by the 360, 365 issue. Yeah, in fairness, I understand exactly what you're referring to. And this was done in a quick manner. Andy submitted a spreadsheet from his finance department that had the calculation based on a 365, 360 day a year. Occidental submitted a different calculation. Judge Hellerstein had discretion. He used his discretion. He abided by our proposed analysis. I can't get into the mechanics of what- Because I don't understand the mechanics either. To be candid, I can't defend that. Doesn't it artificially inflate the interest rate? Well, there's two components of it. One is the rate. The rate that was used, I can absolutely stand by it. I'm happy to explain that. The joint operating agreement, which was the document that gave rise to the dispute between the parties, defines agreed interest rate as LIBOR plus 5% based on the LIBOR rate applicable to the first business day prior to the due date of payment. Well, that's a different issue, but- That's right. So you're focusing on the 360 versus- No, let's talk about that since you've gotten into it. So I guess that's right. So the arbitration panel awarded interest from the date of breach to the date of payment, right? Correct. And the date of breach is March 4th, 2016. That's right. So wouldn't the date of payment have to be the date in which they made the payment? Well, the date of payment was the date we contend, and Judge Hallerstein agreed, the date by which the payment was originally due. As opposed to some artificial date years later when an arbitration- But if they award interest from the date of breach to the date of payment, the date of payment can't be the same as the date of breach, can it? Well, the date of payment of the actual monies, as opposed to the date of payment when the monies were owed. It was the due date of payment that set forth in the contract. And the due date of payment, we contend, and again, Judge Hallerstein agreed, was the due date at the time that payment was supposed to have been made. What is the amount, just for housekeeping purposes, let's say. What's the amount associated with the 360, assuming that that's an error. Just assume. What's the amount associated with that error? Do you know? I'm sorry, which error of the- The 360, 365. That's $3 million, Judge. $3 million, okay. Yeah. All right, thank you very much. I just want to ask about the 360, 365. So it does inflate the interest rate, and some courts have said that it's okay because it is a standard way of calculating interest. But parties have to consent to it because it makes the calculation easier, but it inflates the rate. But there's no argument that here the parties have consented. It's not in the joint operating agreement. It's just a proposal that you made before the district court about how to calculate the pre-judgment interest. Is that correct? The 360 versus 365, that's correct. That's correct. And no explanation, really, from Judge Hallerstein. That's correct. Other than this is the, yes. And your position, you're offering sort of the general statement of deference to the district court, but you're not actually offering an explanation as to why it might have been appropriate for him to do that. You're just saying, yeah, it's kind of in his- Well, it was what we submitted, based on what my client's accounting department had calculated. I can't say more than that, and I won't. But yes, the judge below was entitled to broad discretion in terms of how he would make that calculation, and that delta is $3 million. That is an appropriate signal. Thank you. We'll hear a rebuttal. Thank you, Your Honor. Thank you, Your Honors. Just a few points in rebuttal. First of all, this contract guaranteed us independence and impartiality. I think there is both partiality for having sat with you yesterday, but there's also real questions about independence as well. So I think we're clearly, I have a violation of the contract here. We almost conceitedly have a violation of the AAA rules. My fund tells you, well, your previous cases only involved familial relationships and financial relationships. But if you look at the AAA rules, they specifically cover all three. They cover family, financial, and these kind of relationships. And in the universe of those relationships, I can't imagine one that is more material, and it's more problematic than it wasn't disclosed, than a relationship like this that crosses the lines of neutrality and goes on contemporaneously, particularly in a context where we're not, some people pick arbitration because they want expertise of ex-technical arbitrators. Here, the reason we weren't in court is because we didn't trust the courts of Ecuador to be impartial and independent. The principal value to us of arbitration was this impartiality and this independence, and that is exactly what we didn't get. Can I just, this is going to be a very basic question, but I want to make sure I'm understanding how you're tying it into the Federal Arbitration Act. Is it your position that non-compliance with the contract is an independent basis to set aside the arbitration, or are you relying exclusively on the foreground in the Arbitration Act, and I guess looking at the exceeded authority because they didn't comply with the contract? So, ultimately, it's, for purposes of the FAA, we sort of have a slightly different argument for purposes of the convention. Yeah. But for purposes of the FAA, we need a ground under Section 10. We've raised A2 and A4, and I think just having a violation of the party's agreement would give you a ground for a violation of A4, and that's essentially what Judge Easterbrook said in dictum in the sphere case that this court favorably cited in the certain underwriters case. But I think the way this court treated it in certain underwriters really ended up folding it under 10A2. Right. And this gets me to what, and I apologize by putting the word risk in there and articulating the standard, but here's why I did it. Is because certain underwriters basically says you can show evident partiality by showing that there was a violation of the contract, and that the non-disclosed thing in the contract was material. And then it separately has the evident partiality requirement just based on the statute alone. And it sort of stands for this proposition, which makes sense that in a lot of these contexts, and like the most obvious is Brady, right, the Brady case, the NFL case. Like the parties can contract for sort of, you know, slightly different levels of partiality. And the parties are entitled to what they bargained for. So if the parties bargained for the NFL commissioner to judge his or her own conduct, the parties get it. But here the parties bargained for the AAA rules. And the AAA rules. I'm sorry, go ahead, keep going. The AAA rules have this justifiable doubt standard, which is why it seems to me that if there's a conceded violation of the AAA rules, then I think the right way to think about this- But we've got this overlay of evident partiality. Right, but I don't think, but I think my answer would be evident partiality is applied slightly different in a case where there's a violation of the arbitration contracts and its incorporated rules than if there is no violation. And I think certain underwriters says that. And so I think I can win under either standard, but I do think I get added force from the fact that we bargained for this and made a point of that, and that's just the last point I'll make over my time. Was there an opportunity to engage in discovery on this issue before Judge Ellerstein? We did not certainly waive or forfeit any opportunity. You know, we get into this in the reply brief, but the way that the district courts treat these vacature and particularly the confirmation motions is as equivalent of summary judgment proceedings. We put in at the judge's request sort of statements of disputed facts. And so did we separately move for discovery? I mean, no, but in the same way, if you do that in a normal case, you don't have to move for trial. So I think we have fully preserved our right to get evidence on this. And I just- I'm sorry, just like in the summary judgment analogy, if your argument on summary judgment is, you can't award summary judgment because we need more discovery, that would be an argument you would make at the summary judgment stage. And so I guess one of the questions is, was that part of the argument in the sort of briefing before the district court? I think it was fairly, you know, there's a little bit of translation you have to do for the different contexts. But what I would say is, it's crystal clear that we were effectively saying, we win on this record. So that's kind of like our motion for summary judgment. But by filing the Rule 56.1 sort of statement of material facts, I think we were also very fairly saying, but they don't win their motion for summary judgment unless we, unless you rule against us on these disputed facts or we get some way to get into these facts. Thank you. Can I just ask before you sit down just about the prejudgment interest? Sure. So is that argument that I mentioned right? Because the arbitral panel said, date of breach to date of payment, the date of payment has to be when you actually pay it. It can't be the same as the date of breach. Is that the idea? That is the idea. That's about a $34 million argument as opposed to what we think is about a $3.5 million argument on the 60-65. We do think, you know, the contracts, other places talks about date of breach. We also think if you look at the details of that, like their calculation would require you to be constantly changing the sort of month that you calculate the interest by, whereas if you go by date of payment, you just. Very clear. Yeah, very clear. And on the 360, 365, I mean that is a recognized way that banks often calculate interest. So why was the district court not allowed to use that? Well, it's a recognized way that systematically inflates the rates. And, you know, I mean, for guidance on that issue, it's a relatively dated precedent, but it's very short, that Timber against National Bank of Oregon case that we cite in our brief from the Ninth Circuit. It's got a nice explanation of the issue. And what happened in that case is they found the bank violated the state usury laws, because it systematically increased the interest rate, you know, another 0.2%. So the banks were charging 12.2% instead of the maximum 12%. There was no explanation from Judge Hellerstein. No explanation at all. So it says, I mean, from our standpoint, it's as if they just said, and an extra 3.5 million. Thank you very much. A lot of arbitration today. That concludes today's argument calendar. And I'll ask the courtroom deputy to adjourn the court. Court is adjourned.